IN RE ROBERTO RIVERA ESCALERA, JUDGE, DISTRICT COURT OF PUERTO RICO.

No. 1. Argued May 18, 1953.—Decided June 24, 1953.

*José Trías Monge, Attorney General, José C. Aponte* and *Guillermo Gil Rivera, Special Prosecuting Attorneys at large,* for petitioner. *Isaías Rodríguez Moreno, Guillermo Bauzá* and *Carmelo Avila Medina,* for respondent.

PER CURIAM: On April 8, 1953, the Secretary of Justice of Puerto Rico, in compliance with the terms of an order entered by this Court on the 16th of the previous month, filed a complaint against Roberto Rivera Escalera, Judge of the District Court of Puerto Rico, containing five charges which, copied verbatim, read as follows:

### "FIRST CHARGE

"Sometime during a night in April 1952, while drinking intoxicating liquors together with several friends in 'El Chévere' restaurant in Aguadilla, Puerto Rico, which is a public place, the respondent Roberto Rivera Escalera behaved in an illegal and immoral manner unbecoming to a judge when he fired, as he did fire, his revolver in the presence of several persons at a juke box belonging to the owner of said establishment, Mr. Raúl López Gamio, damaging the mechanism at a cost of $52.

### "SECOND CHARGE

"On or about December 19, 1952, in the commercial establishment of Mr. Ramón Añeses Arrache, in Victoria Street, in Aguadilla, Puerto Rico, the respondent Roberto Rivera Escalera, Judge of the District Court of Puerto Rico, while under the effects of intoxicating liquors, behaved in an illegal and immoral manner unbecoming to a judge when he burst into the latter commercial establishment and interrupted, as he did interrupt, an investigation which was then and there being conducted by Mr. José L. Purcell, an attorney of the Office of Court Administration, and by Prosecuting Attorney Julio Fernández Cabrera, in connection with the events referred to in the FIRST CHARGE of this complaint, the respondent displaying then and there a disorderly and offen-

sive conduct, making use of vile language and obscene words in the presence of the aforesaid investigating officers and of other persons, which compelled the latter officers to stop their investigation.

## "THIRD CHARGE

"On or about December 19, 1952, in Victoria Street, in Aguadilla, Puerto Rico, a few minutes after the events referred to in the SECOND CHARGE, the respondent Roberto Rivera Escalera, Judge of the District Court of Puerto Rico, while under the effects of intoxicating liquors, behaved in an illegal and immoral manner unbecoming to a judge when he disturbed, as he did disturb, the peace and order of the proximate neighborhood by publicly drawing out, showing and exhibiting, as he did take out, show and exhibit, in his right hand a revolver, in a violent, truculent and menacing manner, at the same time that he behaved in a disorderly and offensive manner which provoked citizens Arturo Lausell Ubiñas and Luis Lausell Ubiñas.

## "FOURTH CHARGE

"Sometime in December 1952, in Aguadilla, Puerto Rico, the respondent Roberto Rivera Escalera, Judge of the District Court of Puerto Rico, behaved in an immoral and improper manner unbecoming to a judge, when, knowing that the Hon. Judge Juan B. Zamora, Judge of the District Court of Puerto Rico and Prosecuting Attorney Julio Fernández Cabrera had ordered the Aguadilla Police on December 19, 1952, to file complaints against the respondent and Luis Lausell Ubiñas and Arturo Lausell Ubiñas for Breach of the Peace on account of the events referred to in the THIRD CHARGE of this complaint, the respondent went to the Police Headquarters of that city and, availing himself of his position as a judge, directed the policemen in charge of preparing the complaints in the latter headquarters, Messrs. Juan Nieves Badillo and Rosendo Pellot, not to file the aforesaid complaint for Breach of the Peace against him or against

Arturo Lausell Ubiñas, informing said public officers and making them believe that it had been so ordered by Prosecuting Attorney Julio Fernández Cabrera and Judge Juan B. Zamora, which was false information, and which the respondent knew was false.

"FIFTH CHARGE

"Sometime during January 1953, in a place known as 'El Tamarindo', on the road between Aguadilla and Isabela, the respondent Roberto Rivera Escalera, Judge of the District Court of Puerto Rico, behaved in an illegal and immoral manner unbecoming to a judge when he urged, as he did urge, Orlando Marchand González, as essential witness to the facts involved in the FIRST CHARGE of this complaint, to change the terms of his sworn testimony in connection with the facts which the witness had given before Prosecuting Attorney Julio Fernández Cabrera, in order to help the respondent in the investigation that the latter prosecuting attorney and Mr. José L. Purcell, an attorney of the Office of Court Administration were making of his conduct."

The complaint ends by praying that, after the proper procedure, an order be entered permanently removing the respondent from his position as District Judge.

In the exercise of our discretion and at the request of the Attorney General, we ordered, on the same day the complaint was filed, that the respondent be suspended from office and pay pending a final determination of the case. On that same date we ordered the marshal of this Court to serve a copy of the complaint on the respondent, pursuant to § 24 of the Judiciary Act, [1] and granted the latter 20 days to answer or make whatever allegations he deemed pertinent.

[1] Section 24 of the Judiciary Act of the Commonwealth of Puerto Rico (Act No. 11 of July 24, 1952) provides:

"Section 24.—*Procedure for Removal.*

"Charges made against any judge of the Court of First Instance shall be filed with the Administrative Director of the Office of Court Administration, who shall report the same to the Chief Justice, and if the Supreme Court shall so desire, shall make his recommendation as

After moving for an extension, the respondent answered the first charge of the complaint as follows:

"In connection with the first charge, the respondent admits that sometime in April 1952, he was at a social gathering in 'El Chévere' Restaurant, in Aguadilla, Puerto Rico, accompanied by some friends of irreproachable reputation, and that at the time he was suffering from an intense emotional crisis whose cause he is unable to reveal because it is an intimate and personal affair involving third persons, and that accidentally and without any intention to hurt anyone or to damage the property of others, he fired his revolver unfortunately damaging a juke box belonging to the owner of the establishment, who was indemnified by the respondent for the damages caused. The respondent expressly denies the other facts and conclusions contained in said charge,"

denying the facts set forth in the second, third, fourth and fifth charges of the complaint and setting up as a special

---

to further action or as to dismissal of the charges. The Supreme Court may cause such investigation to be made as it shall deem necessary and may request the Attorney General to make such investigation and report to the Court.

"If the Supreme Court shall determine that there is cause for further proceedings, it may request the Attorney General or other officer of the Court to prosecute the cause. The Attorney General also, of his own motion or by direction of the Governor, may initiate a prosecution for the removal of a judge and shall then act as prosecutor. Prosecution shall be by complaint returnable to the Supreme Court charging the judge with immoral conduct or neglect of judicial duties. The Court shall accord the parties an opportunity to be heard, together with their witnesses and the court may, in its discretion while the proceeding is pending, suspend the judge from performing the duties of his office and receiving his salary. If the Court shall find the charges, or any part of them, sustained, it may censure or suspend the offending judge or remove him permanently from his office as it shall determine the most appropriate penalty under the circumstances.

"The Justices of the Supreme Court shall be removable only by impeachment as provided in the Constitution of the Commonwealth."

The foregoing provisions of the Judiciary Act were approved by our Legislative Assembly pursuant to the authority vested by § 11 of Article V of the Constitution of the Commonwealth of Puerto Rico, which insofar as pertinent reads:

". . . *Judges of the other courts may be removed by the Supreme Court for the causes and pursuant to the procedure provided by law.*" (Italics ours.)

defense that this Court lacks jurisdiction to take cognizance of the facts alleged in the first charge.[2]

The hearing of the complaint commenced on May 18 at 9 a. m., in a division composed of three judges of this Court. The respondent was present personally and assisted by counsel. The Attorney General also appeared through two of his special prosecuting attorneys at large. At the beginning of the hearing the complainant raised the question that since the respondent admits in his answer the facts alleged in the first charge, under the circumstances set forth above, and considering that the facts charged therein are of such a nature that they could result in the respondent's removal, the case in his opinion, could be submitted on that charge alone. The respondent maintained that the complainant's contention was belated. The Division took the question under advisement and proceeded at once to hear the evidence of both parties on all the charges contained in the complaint. We shall say now that since in the answer, as well as in the amended answer, the respondent admits the facts alleged in the first charge subject to certain conditions—as we have seen—the question raised should be and is dismissed. Let us go to the merits of the complaint.

Both the complainant and the respondent introduced abundant oral and documentary evidence. The hearing continued during that entire day and until the dawn of the following day. After the prosecuting attorneys stated that they did not wish to argue orally and after one of respondent's attorneys argued briefly, the case was submitted to our consideration.

---

[2] In an amended answer subsequently filed "the respondent admits the facts alleged in the first charge, but alleges that he acted thus under the effects of an intense emotional crisis whose cause he is unable to reveal because it is an intimate and personal affair involving third persons. He alleges furthermore that he indemnified the owner of the establishment for the damages caused to the juke box," denies the facts set forth in the second, third, fourth and fifth charges of the complaint and waives his special defense of lack of jurisdiction.

We have thoroughly and carefully examined all the evidence offered, as well as the transcript of the oral argument to which we have referred. As a result of such examination, and after considering all the pertinent elements of evidence, we resolve the conflict in the evidence and make the following

*Findings of Fact*

On the night of April 13, 1952, the respondent and a group of his friends were in "El Chévere" restaurant, of Aguadilla, where they had gone "to eat a goat." All those present, including the respondent, drank liquor. A juke box there was playing the record "*Y Sin Embargo Te Quiero.*" That record brought back certain memories to the respondent; he got up, pulled out his revolver and fired at the juke box, damaging it. Shortly thereafter he went to the house of Orlando Marchand González, a radio mechanic, and asked the latter to accompany him in his automobile to the restaurant to repair the juke box. He arrived intoxicated at Marchand González' house and in that condition drove his automobile. Marchand González went with the respondent to "El Chévere" and there saw the damage caused by the shot to the juke box. On the following day Ramón Añeses Arrache, a dealer in such juke boxes, by wire ordered from the San Juan agent the necessary parts to repair the juke box. The cost of the repairs, which amounted to $52.60, were paid by Judge Rivera Escalera.

As a consequence of the facts mentioned above, someone filed a complaint against the respondent in the Office of Court Administration. Following orders from his superiors, José A. Purcell, attorney-at-law, went to Aguadilla on December 19, 1952, to investigate what had happened. Since Mr. Purcell was not authorized to take oaths, when he arrived at Aguadilla he asked Prosecuting Attorney Julio Fernández Cabrera to co-operate with him. Messrs. Purcell and Fernández Cabrera went to the office of Ramón Añe-

ses Arrache, the employer of Orlando Marchand González. While the latter was being questioned, the respondent suddenly appeared in said office and upon seeing them, addressed them in a loud voice and violent manner: "This is what I wanted to know, what you were doing . . . Lausell is a son of a . . . and I will shoot it out with any one and with Héctor Reichard too." The respondent was violent and gave signs of having been drinking. Messrs. Fernández Cabrera and Purcell tried to calm him down, the former advising him to go to San Juan, in order to avoid any incident. The respondent did not follow that advice and insisted on remaining in Aguadilla. Therefore, Mr. Purcell closed the investigation entrusted to him.

Immediately after the events described in the foregoing paragraph and approximately at 5 p. m. the respondent passed by the commercial establishments of Ramón Añeses Arrache and Luis Lausell. While passing by, the respondent saw Arturo Lausell, called him and asked him whether he defended his brother, to which Arturo answered: "Of course, he is my brother," to which the respondent replied "He is the one with whom I want to shoot it out, and with you too." Luis Lausell, Arturo's brother, was nearby. The argument grew bitter and both the respondent and Luis Lausell drew revolvers, but did not aim at anyone in particular or use them. Harsh phrases were said in loud voices, both by the respondent and by the Lausells. Policeman Ángel Laboy Morales went to the place of the incident, searched Luis Lausell and seized his revolver. A few minutes later the Lausell brothers were arrested and policeman Laboy asked Judge Rivera Escalera to go with him to headquarters. After prosecuting attorney Fernández Cabrera investigated the incident, he and District Judge Juan B. Zamora ordered that the respondent and the two Lausells be accused of disturbing the peace, and Luis Lausell of carrying weapons also.

The following day, that is, on December 20, 1952, the respondent went to headquarters and told the policemen there that Judge Zamora had sent word to accuse Luis Lausell of disturbing the peace and carrying weapons, but not to accuse Arturo Lausell or him for disturbing the peace, which was not true.

On a Sunday in the month of January 1953, Orlando Marchand González, was riding in a pick-up together with his helper Luciano Yulfo past a place calle Tamarindo, in Aguadilla. They met the respondent who was in his automobils near "La Quince" Bar who signalled them to follow him. When all arrived in front of the cemetery, the respondent and Marchand González stopped and got down from their vehicles. Rivera Escalera asked Marchand González to protect him when he testified before the prosecuting attorneys, not to injure him and that "if he could change his testimony somehow without injuring himself to do it" which Marchand González refused to do because he might injure himself.

The record likewise discloses a question which we consider really serious. On the one hand the respondent admits the first charge against him, namely, that while drinking and eating with a group of friends in "El Chévere" restaurant, in Aguadilla, he fired a revolver at a juke box; and on the other, when he testified under oath on February 6, 1953, that is, some ten months later, before Mr. Honorato Pandolfi, a prosecuting attorney designated by the Attorney General to investigate certain administrative charges filed against the respondent, the latter, upon referring to the incident of the night of April 13, 1952, in the aforesaid restaurant, stated the following, which is textually copied:

".        .        .        .        .        .        .        .        .        .

"P. Atty.—Now, Mr. Rivera Escalera, turning from more recent to past events, can you recall what happened one night in the month of May 1952, in El Chévere restaurant, in Agua-

dilla, when a juke box was broken because of certain shots fired there? What did actually happen?

"W.—That night, I do not recall the exact day; in the morning I bought a goat we were going to eat. Then I invited some friends of mine; I invited Dr. Simmons, Dr. Torres.

"P. A.—What is Dr. Torres' first name?

"W.—Plácido Torres, Israel Roldán Blas and other friends to eat the goat in El Chévere restaurant.

"P. A.—Did you take the goat to El Chévere restaurant?

"W.—Yes, sir.

"P. A.—Did you take it there alive?

"W.—Yes, sir.

"P. A.—Was it cooked there?

"W.—Yes, it was cooked there.

"P. A.—When did the gathering start?

"W.—We preferred to meet in the evening because of the time it usually took the cooks to prepare the animal. About seven thirty, more or less, we began to get together; Dr. Simmons and Dr. Torres and the other friends arrived, and we had a beer.

"P. A.—Did you drink beer?

"W.—I drank beer.

"P. A.—Before starting to eat?

"W.—Yes, before eating, because they started to prepare the goat late.

"P. A.—At what time did all of you meet?

"W.—From seven thirty to eight.

"P. A.—Then, while dinner was served, you had a few beers?

"W.—Yes, sir.

"P. A.—Did you eat after that?

"W.—We then ate the goat. For a while we were together talking, chatting, the things were on the table. Then I requested or asked the bartender to give me a package of cigarettes. He told me that he was out of them. I left the place to get them; I went to a place called El Central, at quite a distance from the restaurant. There I met other friends and I drank another beer at the establishment where I had gone to buy the cigarettes, and I drank another beer. I returned to the establishment and Mr. Raúl López called me and told me that somebody had broken the juke box. I told him not to worry, that it was nothing, everything would be paid for, and we stayed for a while and then we left.

"P. A.—Didn't you see the broken juke box?

"W.—Not that night.

"P. A.—When you told him that, didn't Raúl López notice if it was serious?

"W.—They pushed the juke box against the wall.

"P. A.—Then you say you went out? Do you know if your friends stayed there?

"W.—Yes, sir.

"P. A.—When you returned, were they drinking?

"W.—Yes, they were.

"P. A.—Were all the friends there you had left?

"W.—Dr. Simmons had left.

"P. A.—Were Dr. Torres and the others drinking?

"W.—Yes, sir.

"P. A.—Had Dr. Simmons left?

"W.—As a matter of fact, I asked for him and they told me he had left.

"P. A.—About what time did that gathering end?

"W.—About fifteen after eleven or eleven thirty.

"P. A.—You all left together and Dr. Simmons had already gone?

"W.—Yes, sir.

"P. A.—How was the juke box broken?

"W.—I do not know how the juke box was broken; I learned it was due to a shot. I learned it had broken because of a shot Mr. Israel Roldán Blas had fired. Then I took my car, passed by the establishment of Ramón Añeses and told him to go to Raúl López' establishment to fix the juke box which the boys had broken the night before. I drove around a bit and returned to El Chévere and found Marchand, the mechanic, Dr. Torres and Israel Roldán Blas. The mechanic removed the glass and Dr. Torres asked him how much would that cost. The boy told him he didn't know how much the glass was worth and also that he didn't know if something was broken inside. He removed the glass, took a brush he had, cleaned the mechanism, the magic brain, removed the glass particles, and the juke box worked. He then let it play. When Dr. Torres asked him how much the repair would cost, I told Torres that I had told Raúl that I would pay for it, for the repairs, no matter how much.

"P. A.—Why did you undertake to pay for the repairs?

"W.—Snyder asked me that same question. I assumed

responsibility because I knew that I might be involved in an argument because of the place in question and the manner in which things has occurred and because of the damage to the juke box. On the next day I wrote a letter to Mr. Negroni in Santurce telling him that although I had not broken or destroyed the juke box in any way, I assumed responsibility to pay for the damages since it was a party of friends among which I was present. At the same time I asked him to make a reasonable estimate. Then a few days later he wrote me a letter with the bill giving the cost of the glass and of a certain plastic part within the magic brain, which was also damaged. When I received the estimate I made out a check in favor of Mr. Raúl López.

"P. A.—How much was the bill for the juke box?

"W.—Some fifty odd dollars.

"P. A.—Is it true or not that on the night when you had the goat in El Chévere you took with you to that place a record entitled 'Y Sin Embargo Te Quiero'?

"W.—It was playing in the juke box.

"P. A.—Is it true or not that that record was being played?

"W.—Not I.

"P. A.—Was that record played that night?

"W.—It was played.

"P. A.—Is it true or not that when the juke box was being operated, while that record was being played, you were teased by some friends?

"W.—It is not true. In what sense was I teased?

"P. A.—Concerning that record, or some relationship between the record and a sweetheart with whom it is said that you are in love and with whom you have gone out on several occasions?

"W.—There was no joking or anything.

"P. A.—Was it played without any difficulty whatsoever?

"W.—There was no difficulty.

"P. A.—Do you positively assert under oath that when the juke was broken by a shot you were not present there?

"W.—I was not present.

"P. A.—Was everybody present but Dr. Simmons?

"W.—He was when I left the place.

"P. A.—When you returned, was everybody there except Dr. Simmons?

"W.—Except Dr. Simmons.

"P. A.—Who told you that it had been Mr. Roldán Blas who had broken the juke box with a shot?

"W.—When the mechanic came Raúl first told me in the morning.

"P. A.—That it had been broken by a bullet shot?

"W.—Raúl told me it had been broken by a bullet shot.'

"P. A.—Who told you that it had been Mr. Roldán Blas?

"W.—Ricardo López, Raúl's brother.

"P. A.—Next morning?

"W.—Next morning.

"P. A.—Did you notice whether Mr. Roldán Blas had a firearm that night?

"W.—No, sir. In connection with that, I want to make the following clear: In the morning when I learned that it had been a shot fired by Roldán, that he had done it, I asked him what revolver he had used, and he then told me that it had been with mine. He told me, as you left your coat on the chair in which you had been seated, I took it and then Dr. Torres grabbed it and that's when the gun went off. Then I went to the room and I looked for the revolver which I had left on the table, I opened it and I noticed that a bullet had been fired.

"    .    .    .    .    .    .    .

"P. A.—Did you say that you were gone when that happened?

"W.—Yes, I had left.

"    .    .    .    .    .    .    .

"W.—I wish to make it clear that there was only one shot.

"P. A.—How do you know if there was only one shot, not two or three?

"W.—Because I saw the juke box and it had only one perforation in the front glass; since the act was performed with my weapon, when I examined my revolver I realized that only a single bullet had been fired.

"P.A.—Was the act done in a violent manner?

"W.—I cannot say that. There was no uproar, nor violence. It was a joke on the part of Dr. Torres who went to release the catch of the revolver to look at it; it was a joke, there was no argument; he told him, give me that revolver to see it.

"    .    .    .    ♦ .    .    .    .

"P. A.—Now, tell me, is it true or not. that you admitted before now that you had been the one who fired, under the effects of the drinks, at that juke box?

"W.—I have admitted to no one, absolutely to no one, that I fired at that juke box.

"P. A.—Now, tell me, if I brought you persons who were there with you and persons who learned about those facts, who would say that you did it, because of a record that was being played and because you were being teased, that you drew your revolver and fired at the record and wanted later to repair the material damage of what had happened?

"W.—I know that there is no one in Puerto Rico or Aguadilla to whom I admitted that or who saw me fire. If any person says it, it is natural to conclude that someone told it to that person, since that person must have been ordered, prepared or bought to testify in such a manner, or somebody who has something against me or owes his subsistence to another person who is interested in doing me harm.

"          .          .          .          .          .          .          .

"P. A.—Then, sir, do you deny having fired a shot in El Chévere restaurant in an evening in the month of May 1952?

"W.—Yes, I deny it."

"          .          .          .          .          .          .          .

And on the other hand not only in his answer did the respondent admit that the facts imputed in the first charge happened in the manner charged, but also he took the witness stand and under oath admitted having lied in his testimony to Prosecuting Attorney Pandolfi, saying that it was true that he had fired his revolver at a juke box on the night in question. He explained, however, that it was due to the fact that on the previous evening he had met his sweetheart, talked with her and, although she had formerly agreed to marry him, she then told him that she had decided not to do so, not to marry, which caused him to be emotionally upset, that he was exasperated when he heard the record we have mentioned, and fired the shot at the juke box at that moment.

There is also in the record offered by the complainant a letter addressed on May 21, 1952, by the respondent to José A. Negroni, representative in Puerto Rico of Seeburg juke boxes, similar to the one damaged. In that letter Rivera

Escalera gives a third version of what happened in El Ché-
vere restaurant, telling Negroni, among other things, the
following:

"I wish to inform you that sometime during the month of
April I was in Mr. López' restaurant together with some
friends, giving a small party.

"One of my friends started playing with a Coca Cola bottle
which unfortunately struck the glass of the juke box, cracking
the glass and at the same time breaking the cap that covers
the brain of the juke box. I, of course, agreed to pay for the
damages in order to avoid any unpleasantness. . . ."

▇▇▇▇ The Judiciary Act provides that the procedure
for the removal of a judge of the Court of First Instance
"shall be by complaint returnable to the Supreme Court
charging the judge with immoral conduct or neglect of
judicial duties." "Immoral conduct" has been defined as
that conduct which is willful, flagrant, or shameless, and
which is morally indifferent to the opinion of the respectable
members of the community. *In re Hicks*, 20 P. 2d 896;
*Paust* v. *Georgian*, 179 N. W. 735.

Each and every one of the charges formulated have been
fully proved. They are truly serious and not only that, but
the evidence introduced has shown, moreover, that the re-
spondent, a person invested with the difficult task of impart-
ing justice to his fellow creatures, lied willfully.

The respondent's attitude in the witness stand charging
Héctor Reichard, an attorney from Aguadilla—who was not
present—with unethical conduct in trying to exercise undue
influence over his judicial decisions and in trying to obtain
favors by means of gifts, deserves our severest censure. His
own testimony proved how unfounded his imputations were.

In view of the foregoing an order will be entered order-
ing the removal of the respondent Roberto Rivera Escalera
from his position as Judge of the District Court of Puerto
Rico.